# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| SHARON HAWKINS, individually and derivatively on behalf of MEDAPPROACH, L.P., | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. 2021-0453-JTL |
| W. BRADLEY DANIEL, an individual, and MEDAPPROACH HOLDINGS, INC., a Delaware corporation, | ) ) ) ) | |
| Defendants, | ) ) | |
| and | ) ) | |
| MEDAPPROACH, L.P., a Delaware limited partnership, | ) ) ) | |
| Nominal Defendant. | ) | |

## MEMORANDUM OPINION

Date Submitted: August 10, 2021
Date Decided: August 24, 2021

Richard I. G. Jones, Jr., John G. Harris, BERGER HARRIS LLP, Wilmington, Delaware; *Attorneys for Plaintiff.*

David J. Teklits, Sara Toscano, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; Jeffrey Alan Simes, GOODWIN PROCTER LLP, New York, New York; *Attorneys for Defendants.*

**LASTER, V.C.**

MedApproach, L.P. (the "Partnership") is a Delaware limited partnership that dissolved on February 28, 2021. As its principal asset, the Partnership owns shares representing 75% of the issued and outstanding equity of N.D. Management, Inc. (the "Majority Shares").

Defendant W. Bradley Daniel is the sole owner of defendant MedApproach Holdings, Inc. ("Holdings"), which serves as the general partner of the Partnership. Under the limited partnership agreement governing the Partnership, Holdings has the obligation to wind up the affairs of the Partnership, which includes maximizing the value of its assets.

Over two decades ago, the Partnership's predecessor executed an irrevocable proxy that granted three individuals the authority to vote the Majority Shares (the "Irrevocable Proxy"). One of the proxyholders has died. Daniel is one of the two remaining proxyholders.

Plaintiff Sharon Hawkins owns 88% of the limited partner interests in the Partnership. She seeks a declaratory judgment that the Partnership can sell the Majority Shares free and clear of the delegation of voting authority conferred by the Irrevocable Proxy. She also seeks equitable relief to ensure that Daniel and Holdings do not favor Daniel's interests by insisting on selling the Majority Shares subject to the Irrevocable Proxy.

This action thus presents two narrow issues. The first requires applying the language of the Irrevocable Proxy to a sale of the Majority Shares during the winding up process. The second requires evaluating the fiduciary duties that Daniel and Holdings owe during

the winding up process. Both questions arose recently as a result of the Partnership dissolving.

The defendants have moved to dismiss the complaint under Rule 12(b)(3). They maintain that the court should dismiss this case in favor of a lawsuit that the plaintiff filed eight years ago—in 2013—and which remains pending in the United States District Court for the Southern District of New York (respectively, the "New York Action" and the "New York Court").

Over the years, the New York Court has issued a string of decisions and has disposed of a series of claims relating to the Partnership. The sole remaining claim before the New York Court concerns compensation that Daniel paid himself in 2016 and 2017. That claim appears to be headed to trial.

In their effort to obtain dismissal, the defendants invoke both the doctrine of *forum non conveniens* and the concept of claim splitting. Neither warrants the court declining to proceed with the case. The narrow claims that Hawkins has filed here are distinct from the issues that the New York Court has addressed and from the compensation issues that the New York Court will adjudicate. Moreover, it would result in considerable inefficiency for Hawkins to present her current claims in the New York Action, which would force that long-running case to return to the pleading stage. This decision therefore denies the defendants' motion.

## I. FACTUAL BACKGROUND

The facts are drawn from the complaint, the documents that it incorporates by reference, and the materials submitted in connection with the Rule 12(b)(3) motion. When

2

considering a motion under Rule 12(b)(3), the trial court can consider sources of information extrinsic to the complaint. *Focus Fin. P'rs, LLC v. Holsopple*, 250 A.3d 939, 952 (Del. Ch. 2020).

## A. The Sublicense

The distant origins of the current dispute lie in the awarding of a sublicense to manufacture, market, and distribute RU-486, an oral abortifacient (the "Sublicense"). A French pharmaceutical company granted a license to manufacture, market, and distribute RU-486 in the United States to Population Council, Inc. ("Popco"), an international not-for-profit corporation focused on family planning. Compl. ¶¶ 13–14. Popco granted the Sublicense to Joseph D. Pike. *Id.* ¶ 15.

As the operating entity to own the Sublicense and pursue the commercialization of RU-486, Pike formed Danco Laboratories, Inc. That entity started its existence as a company formed under the law of the Cayman Islands. It subsequently became a Delaware limited liability company called Danco Laboratories, LLC. *See* Dkt. 16, Ex. C ¶ 17. This decision refers to it as "Danco Labs."

Pike created Neogen Investors LP ("Neogen LP"), a California limited partnership, as a holding company that owned all of the equity in Danco Labs. Neogen LP's successor is a California limited partnership called Danco Investor Group L.P. *Id.* ¶ 18. Pike raised capital from investors by selling limited partner interests. For simplicity this decision refers to the limited partnership as "Danco LP."

Pike formed N.D. Management, Inc. as the general partner of Danco LP. Because of its role, this decision refers to N.D. Management as "Danco GP." That entity also started

its existence as a company formed under the law of the Cayman Islands. Danco GP subsequently became a Delaware corporation. Danco GP remains the sole general partner of Danco LP. Compl. ¶¶ 16, 37.

Pike originally owned 100% of the stock in Danco GP. Through Danco GP, he controlled Danco LP. Through Danco LP, he controlled Danco Labs. *See id.* ¶ 16.

## B. Mr. And Mrs. Hawkins Become Involved.

In 1995, non-party Gregory Hawkins met Pike through a mutual friend. *Id.* ¶ 17. Gregory Hawkins is the husband of the plaintiff, Sharon Hawkins.[1]

When the meeting took place, Pike was soliciting investments in Danco LP. The mutual friend who introduced Mr. Hawkins to Pike suggested that Mr. Hawkins invest through a fund managed by his cousin. The cousin was Daniel. *Id.*

---

[1] My usual practice is to refer to individuals using their last names without honorifics, or alternatively to use first names. This decision departs from that practice and refers to Gregory and Sharon Hawkins, respectively, as "Mr. Hawkins" and "Mrs. Hawkins." It does so because the investment that Mr. and Mrs. Hawkins made has given rise to many judicial decisions, and those appellations track how other courts have referred to Mr. and Mrs. Hawkins.

This decision adopts a series of other designations, including short-hand labels for entities and provisions in the relevant agreements. During future proceedings in this case, the court asks the parties to use the terms from this decision. The court has attempted to frame them neutrally, and the court finds them helpful for thinking about the dispute. It will be inefficient for each side to persist with its own set of defined terms, then for the court to have to translate those alternative usages. That might seem to go without saying, but parties too often ignore the court's terms and continue using their own divergent nomenclatures.

Daniel formed MedApproach L.P. ("Old MedApproach"), a Tennessee limited partnership, as a special purpose vehicle to invest in Danco LP. *Id.* ¶ 18. The general partner of Old MedApproach was Bio-Pharm Investments, Inc., a Tennessee corporation. Daniel owned all of its shares. *See* Dkt. 16, Ex. C ¶ 25.

Mr. Hawkins purchased limited partner interests in Old MedApproach. Compl. ¶¶ 19–20. Old MedApproach purchased limited partner interests in what became Danco LP.

## C. The Settlement Agreement, The Irrevocable Proxy, And The Addendum

In 1996, Popco learned that Pike had a prior criminal conviction. Popco sued Pike to cancel the Sublicense. Compl. ¶ 23.

Mr. Hawkins worked with Daniel and other investors to broker a solution. In 1997, their efforts resulted in an agreement to eliminate Pike's control over Danco GP (the "Settlement Agreement"). Danco GP had (and continues to have) only 100 shares that were issued and outstanding. Under the terms of the Settlement Agreement, Pike committed to sell 75 shares, representing 75% of the equity in Danco GP, to Old MedApproach. Those 75 shares comprise what this decision calls the "Majority Shares." Pike would retain the other 25 shares, but he agreed that they would become non-voting shares (the "Pike Shares"). It appears that the transfer of the Majority Shares would not be complete until Old MedApproach had paid the full purchase price to Pike, which would happen over time.[2]

---

[2] *See* Compl. ¶¶ 28–29; *Hawkins v. MedApproach Hldgs., Inc.* (*Second SDNY Dismissal*), 2015 WL 8480076, at *1 (S.D.N.Y. Nov. 30, 2015) (summarizing allegations in Mrs. Hawkins' amended complaint the New York Action); *Hawkins v. MedApproach Hldgs., Inc. (First SDNY Dismissal)*, 2014 WL 3926811, at *2 (S.D.N.Y. Aug. 11, 2014) (summarizing allegations in Mrs. Hawkins' complaint the New York Action); *see also Pike*

To ensure that Daniel gave up control immediately over all of the voting rights associated with the shares of Danco GP, the Settlement Agreement called for Pike to execute the Irrevocable Proxy. Dated February 5, 1997, the Irrevocable Proxy memorialized that fact by stating that it was issued in connection with the Settlement Agreement, which the Irrevocable Proxy described as "that certain Agreement Regarding Neogen Project . . . , dated as of January 21, 1997." Dkt. 16 Ex. A at 1.

### 1. The Terms Of The Irrevocable Proxy

Through the Irrevocable Proxy, Pike appointed three individuals as his proxies with authority to vote all 100 shares in Danco GP. The operative paragraph stated:

> The Stockholder hereby constitutes and appoints each Holder, during the term of this Irrevocable Proxy, as the Stockholder's true and lawful proxy and attorney-in-fact, with full power of substitution, to vote all of the Shares plus any additional Shares which Stockholder may own or hold as of the date of any such vote (and any all [sic] securities issued or issuable in respect thereof) which Stockholder is entitled to vote (collectively, the "Proxy Shares"), for and in the name, place and stead of the Stockholder, at any annual, special or other meeting of the stockholders of the Company, and at any adjournment or postponement thereof, or pursuant to any consent in lieu of a meeting or otherwise.

*Id.* § 1 (the "Appointment Provision"). The Irrevocable Proxy defined the Stockholder as "Joseph D. Pike," and when he executed the Irrevocable Proxy, Pike owned all 100 shares in Danco GP. Technically, therefore, the Irrevocable Proxy covered both the 75 Majority

---

*v. Freeman*, 266 F.3d 78, 81 (2d Cir. 2001) (addressing appeal from entry of arbitral award resolving dispute over Pike's performance of obligations under Settlement Agreement and his right to payments; noting that "[i]n return for the sale [of the Majority Shares] and for fulfilling other obligations, Pike was to receive certain payments"); *id.* at 82 (summarizing Pike's allegations regarding payments to which he was entitled).

Shares and the 25 Pike Shares. It also technically encompassed any other, as-yet unissued shares in Danco GP that Pike might come to own. The Irrevocable Proxy defined that universe of shares collectively as the "Proxy Shares." For purposes of this case, the shares that matter are the Majority Shares.

Through the Appointment Provision, Pike granted voting authority over the Proxy Shares to the "Holders," defined as Brian M. Freeman, Jeffrey L. Rush, and Daniel. *Id.* Ex. A. The Irrevocable Proxy required the Holders to vote the Proxy Shares as they determined by majority vote. *Id.* § 7. Freeman died in 2001, leaving Rush and Daniel as the only remaining Holders. *See SDNY SJ Decision*, 2020 WL 4349813, at *4.

The Irrevocable Proxy recited that it was coupled with an interest and was irrevocable. The relevant language stated:

> All power and authority hereby conferred is coupled with an interest and is irrevocable. In the event any applicable law imposes a mandatory limit on the period of time for which a proxy or other rights as referenced herein may be granted, it is the intention of the parties that this Irrevocable Proxy and the related rights granted herein shall expire on the latest date permissible under such applicable law, and the parties hereto hereby waive any such time limitation to the fullest extent waivable and hereby extend and/or agree to extend such time limit (by amendment, renewal or otherwise) to the fullest extent extendable under such law.

Dkt. 16 Ex. A § 1 (the "Irrevocability Provision").

Reinforcing the Irrevocability Provision, Section 5 of the Irrevocable Proxy contained the following additional commitment:

> The Stockholder agrees that such Irrevocable Proxy is coupled with an interest sufficient in law to support an irrevocable power and shall not be terminated by any act of the Stockholder (other than in connection with the termination provisions of Section 4 hereof), by death or disability of the

7

Stockholder, by lack of appropriate power or authority or by the occurrence of any other event or events other than as provided in Section 4 hereof.

*Id.* § 5 (the "Survival Provision").

But while the Irrevocable Proxy stated that it was irrevocable, it did not contemplate a permanent existence. The Irrevocability Provision itself acknowledged the possibility of a mandatory time limit under applicable law. Another provision provided for the Irrevocable Proxy to terminate in connection with a further reorganization contemplated by the Settlement Agreement. The same provision empowered the Holders to terminate the Irrevocable Proxy. The operative language stated:

> This Irrevocable Proxy shall terminate immediately upon the occurrence of any of the following:
>
> (i)      the merger or other reorganization of the Company in connection with the formation of "Newco" as contemplated in the Agreement, but only if and to the extent the terms and conditions of the documentation pursuant to which such merger or other reorganization is effected expressly refer to this Irrevocable Proxy and expressly provide that this Irrevocable Proxy shall terminate pursuant to such documents; or
>
> (ii)     upon notice of termination given by the Holders to the Stockholder.

*Id.* § 4 (the "Termination Provision") (formatting added).

## 2.    The Terms Of The Addendum

Through the Irrevocable Proxy, Pike granted the authority conferred by the Appointment Provision to the Holders. Under the Settlement Agreement, however, Old MedApproach was purchasing the Majority Shares. A mechanism was needed for Old MedApproach to sign on to the Irrevocable Proxy once it acquired the Majority Shares.

The result was an addendum to the Irrevocable Proxy. Its language consists of a single dense paragraph. In its entirety, the paragraph states:

> At any time that [Old MedApproach], or its affiliates, owners, designees or nominees (or their respective successors or assigns) (each a "MedApproach Person") is a beneficial or record holder of any of the Shares or any of the Proxy Shares, [Old MedApproach] hereby agrees (and agrees to cause each other MedApproach Person to agree) that references in this Irrevocable Proxy to "Stockholder" shall mean and include [Old MedApproach] (or such MedApproach Person) with references to "the date hereof" in Section 2(a) being instead a reference to the date of closing under the Agreement), and that [Old MedApproach] is bound (and [Old MedApproach] agrees not to transfer any such shares to any other MedApproach Person unless such transferee agrees in writing satisfactory to the Proxy Holders (other than W. Bradley Daniel) to be bound) by this Irrevocable Proxy as the Stockholder; provided; however, no MedApproach Person shall be deemed the Stockholder for purposes of Section 2 hereof. [Old MedApproach] agrees to duly authorize, execute and deliver a restated Irrevocable Proxy reflecting the foregoing promptly after the closing under the Agreement and such other agreements or documents as are reasonably necessary or appropriate to carry out the intent of the foregoing.

*Id.*, Addendum (the "Addendum").

The Addendum has multiple parts. First, it defines the term "MedApproach Person" to consist of Old MedApproach and "its affiliates, owners, designees or nominees (or their respective successors or assigns)." *Id.* (the "Affiliate Definition").

Second, the Addendum provides that if Old MedApproach or any other MedApproach Person became a beneficial or record owner of any shares of Danco GP, then

> [Old MedApproach] hereby agrees (and agrees to cause each other MedApproach Person to agree) that references in this Irrevocable Proxy to "Stockholder" shall mean and include [Old MedApproach] (or such MedApproach Person) with references to "the date hereof" in Section 2(a) being instead a reference to the date of closing under the Agreement).

9

*Id.* (the "Expanded Stockholder Definition").

Third, the Addendum states:

[Old MedApproach] is bound (and [Old MedApproach] agrees not to transfer any such shares to any other MedApproach Person unless such transferee agrees in writing satisfactory to the Proxy Holders (other than W. Bradley Daniel) to be bound) by this Irrevocable Proxy as the Stockholder . . . .

*Id.* (the "Transfer Provision").

The Addendum thus contains overlapping provisions and redundancies. Both the Transfer Provision and Old MedApproach's promise that it "is bound" by the Irrevocable Proxy stand in tension with the Expanded Stockholder Definition, because if the language of the Expanded Stockholder Definition means what it says, then Old MedApproach already was bound by the Irrevocable Proxy. In light of the Expanded Stockholder Definition, Old MedApproach should not have needed to bind itself to the Irrevocable Proxy, nor should Old MedApproach have needed to commit itself to bind any other MedApproach Person to the Irrevocable Proxy.

## D.    The Restructurings

After the execution of the Settlement Agreement, two restructurings took place that resulted in the parties to the case occupying their current positions relative to each other. One restructuring involved Mr. and Mrs. Hawkins. The other restructuring involved Old MedApproach.

10

The restructuring on the Hawkins side was simple. Effective July 2, 1998, Mr. Hawkins assigned all of his interests in Old MedApproach to Mrs. Hawkins.[3] The New York Court has held that despite transferring his interests to his wife, Mr. Hawkins continued to manage the investment. *Hawkins v. MedApproach Hldgs., Inc.* (*SDNY SJ Decision*), 2020 WL 4349813, at \*1, 8 (S.D.N.Y. July 29, 2020).

The restructuring of Old MedApproach was more complex and took place in 1999. The nature of the restructuring suggests an effort to separate income streams that could qualify for treatment as capital gains from other income streams that would be taxed as income.

As part of the restructuring, Daniel formed three new Delaware limited partnerships (the "Three Partnerships"). The Partnership was one of them. Daniel also formed Holdings, which became the general partner of each of the Three Partnerships. Holdings has no assets other than its general partner interests in the Three Partnerships. Compl. ¶¶ 35–37.

---

[3] Of passing interest, Daniel has alleged in other litigation that Mr. Hawkins suffered personal financial difficulties in 1998 as a result of the collapse of Long-Term Capital Management L.P., where he was a principal. *See MedApproach Hldgs., Inc. v. Mrs. Hawkins* (*First Tennessee Dismissal*), 2012 WL 6569268, at \*2 (M.D. Tenn. Dec. 17, 2012). The demise of that excessively leveraged hedge fund threatened to bring down the global financial markets, necessitating a then-unprecedented intervention by a consortium of Wall Street firms assembled hastily by the Federal Reserve Bank of New York. The transfer of his interests to his wife would have corresponded to a time when his personal assets were under threat. *See id.*

11

In the transaction at the heart of the restructuring, Old MedApproach dissolved. As part of the winding up process, Old MedApproach made non-*pro rata* distributions of its assets to the Three Partnerships. The Partnership received the Majority Shares.

The parties agree that the following diagram accurately depicts the organizational structure of the relevant entities after the restructuring. It refers to Holdings as "Med Approach Holdings." It refers to the Partnership by its formal name, MedApproach LP. And it refers to Danco GP as "N.D. Management." Except for the fact that the Partnership has dissolved and entered the winding up phase, the diagram reflects the organizational structure of the relevant entities as it continues to exist today.



Dkt. 16 at 7.

As shown in the diagram, Danco Labs owns the Sublicense. Danco LP owns 100% of the equity in Danco Labs. A number of investors own limited partner interests in Danco LP, with Mrs. Hawkins beneficially owning the largest stake through her interests in the Three Partnerships. Danco GP controls Danco LP as its general partner. Through the Irrevocable Proxy, the Holders control Danco GP by virtue of their ability to exercise the voting power carried by the Majority Shares. But for the Irrevocable Proxy, the Partnership would control Danco GP through the Majority Shares. *See SDNY SJ Decision*, 2020 WL 4349813, at *1.

## E.     The Many Disputes Between The Parties

By 2001, all of the financial obligations to Pike had been satisfied, so there was no possibility that he could reassert control over Danco GP. At that point, Mr. Hawkins asked Daniel to terminate the Irrevocable Proxy. Daniel initially demurred, then asserted that the Irrevocable Proxy was irrevocable and could not be relinquished. Compl. ¶¶ 38–39.

In 2011, Daniel caused Holdings to sue Mr. and Mrs. Hawkins in the United States District Court for the Middle District of Tennessee. Daniel alleged that Holdings was entitled to hedge-fund-style fees, including a 1% annual management fee, a carried interest in 10% of the distributions made by two of the Three Partnerships, and a carried interest in 20% of the distributions made by the third of the Three Partnerships. *See First Tennessee Dismissal*, 2012 WL 6569268, at *3. The complaint asserted that to avoid their obligation to pay those fees, Mr. and Mrs. Hawkins fraudulently induced Holdings to permit them to transfer interests in the Three Partnerships to entities that they claimed not to control. In reality, Mr. and Mrs. Hawkins controlled the transferee entities. After initially dismissing

13

the complaint with leave to replead, the Tennessee court permitted a claim for fraud and a claim for civil conspiracy to proceed past the pleading stage. *See MedApproach Hldgs., Inc. v. Mrs. Hawkins*, 2013 WL 3789515, at \*14 (M.D. Tenn. July 18, 2013). After three more years of litigation, the parties settled and dismissed the Tennessee action with prejudice. *See MedApproach Hldgs., Inc. v. Mrs. Hawkins*, Civ. No 3:11-cv-01199, ECF No. 125 (M.D. Tenn. Oct. 11, 2016).

In 2013, while the Tennessee action was pending, Mrs. Hawkins filed the New York Action. She asserted claims falling into three categories. *See First SDNY Dismissal*, 2014 WL 3926811, at \*1 (summarizing claims).

First, Mrs. Hawkins asserted claims associated with the origins of the Irrevocable Proxy. In one claim, she sought a declaratory judgment invalidating the Irrevocable Proxy, contending that it was intended to be a temporary measure and that the Holders were obligated to replace it with an ordinary corporate governance structure once the transfer of the Majority Shares was complete. The defendants moved to dismiss that claim as untimely. The New York Court agreed that the claim was presumptively untimely, but granted Mrs. Hawkins leave to replead. *Id.* at \*6. In a related claim, Mrs. Hawkins contended that Daniel had breached his fiduciary duties by accepting the fees contemplated by the Irrevocable Proxy. The New York Court dismissed this claim as untimely, finding that Mrs. Hawkins knew of the fees—and hence was on notice of the facts giving rise to her claim—when the Irrevocable Proxy was executed. The New York Court did not give Mrs. Hawkins leave to replead that claim. *Id.* at \*5.

14

Second, Mrs. Hawkins challenged Daniel and Holdings' refusal to convert Danco GP into an S corporation. She maintained that Daniel and Holdings had admitted that the conversion would generate tax benefits for Danco GP's stockholders and were acting disloyally by failing to pursue it. The New York Court declined to dismiss that claim. *See id.* at *7–10.

Third, Mrs. Hawkins claimed that Daniel and Holdings had breached their fiduciary duties and violated contractual obligations by withholding distributions that the Three Partnerships were obligated to make. *Id.* at *10. The New York Court declined to dismiss that claim. *See id.* at *11.

Mrs. Hawkins subsequently filed an amended complaint in which she reasserted her claim that the Irrevocable Proxy was intended to be a short-term measure that the Holders were obligated to replace. To avoid the defendants' statute-of-limitations defense, she sought to provide a factual basis for her invocation of tolling doctrines. The defendants again moved to dismiss the claims as untimely, and the New York Court again granted their motion. The court explained that Mrs. Hawkins was on notice since 2001 that Daniel contended that the Irrevocable Proxy was not a temporary measure, yet she had not sued until 2013. *See Second SDNY Dismissal*, 2015 WL 8480076, at *3–4.

In 2020, the defendants moved for summary judgment on Mrs. Hawkins' remaining claims. The New York Court started by addressing Mrs. Hawkins' theory that Daniel and Holdings had breached their fiduciary duties by failing to reorganize Danco GP as an S corporation. The conversion would have required a distribution of the Majority Shares to their beneficial owners, resulting in Mrs. Hawkins owning 88% of the Majority Shares.

15

Mr. Hawkins had pushed for the Holders to terminate the Irrevocable Proxy in connection with the conversion, and Daniel had refused. The New York Court dismissed this claim, holding that Mrs. Hawkins was not a proper representative plaintiff to pursue it derivatively. Citing extensive evidence which showed that Mr. and Mrs. Hawkins sought to link the conversion to the termination of the Irrevocable Proxy, the New York Court found that Mrs. Hawkins had an ulterior motive for seeking the conversion. *SDNY SJ Decision*, 2020 WL 4349813, at *8–9. The court concluded that "Mrs. Hawkins is an inadequate representative not because she advances her claims alone, but because she purports to advance a claim on behalf of the corporation for tax restructuring, but in deed and word has sought to advance her interest as to the proxy." *Id.* at *9.

Next, the New York Court considered a claim that in 2010, the Holders had caused Danco LP to issue a 10% limited partner interest to themselves personally. *See id.* at *3–4. The New York Court granted summary judgment for the defendants on this claim, finding that it was time-barred. *Id.* at *10. The New York Court declined to apply any tolling doctrines, finding that (i) Daniel had advised Mr. Hawkins about the anticipated issuance in 2008 and 2009 and (ii) Mrs. Hawkins received distributions after 2010 that reflected the issuance. *Id.* at *10–11.

After that, the New York Court considered Mrs. Hawkins' claim that Daniel caused Holdings to withhold distributions from the Three Partnerships. *Id.* at *4–5. The New York Court granted summary judgment for the defendants, holding that any claim on that topic was a compulsory counterclaim that had to be asserted in the Tennessee action. The dismissal of the Tennessee action therefore foreclosed the claim. *See id.* at *12.

16

Finally, the New York Court considered Mrs. Hawkins' claim that Daniel breached his fiduciary duties in 2016 and 2017 by causing Holdings to make excessive and improper payments to himself and the Chief Financial Officer of Danco Labs. *Id.* at *5–7. The New York Court granted summary judgment for the defendants as to the payments to the CFO, finding that there was no basis to rebut the presumptions of the business judgment rule. *Id.* at *13–14. The New York Court denied the motion for summary judgment as to the payments that Daniel made to himself, finding that the defendants would have to prove that the payments were entirely fair. *Id.* at *15.

As a result of these rulings, the only live claim remaining in the New York Action is Mrs. Hawkins' challenge to Daniel's compensation in 2016 and 2017.

## F.     The Partnership Dissolves.

The internal affairs of the Partnership are governed by an Agreement of Limited Partnership dated as of January 1, 1999. Dkt. 1 Ex. A (the "Partnership Agreement" or "PA"). Section 2.7 of the Partnership Agreement provided that the term of the Partnership would expire on December 31, 2020. *Id.* § 2.7. Section 9.1 of the Partnership Agreement provided that "[t]he Partnership shall terminate upon the expiration of its term." *Id.* § 9.1.

As the end of the Partnership term approached, Daniel and Holdings asked the limited partners to extend its existence. As the holder of 88% of the limited partner interests, Mrs. Hawkins controlled the vote of the limited partners. She agreed to extend the term of the Partnership until February 28, 2021, but not beyond. Compl. ¶ 42.

On February 28, 2021, the Partnership dissolved. Section 9.1 of the Partnership Agreement provides that after the Partnership dissolves, "no further business shall be done

17

in the Partnership name except the completion of any incomplete transactions and the taking of such action as shall be necessary for the winding up of the affairs of the Partnership and the distribution of its assets." PA § 9.1.

Section 9.2 of the Partnership Agreement empowers Holdings as general partner to wind up the Partnership's affairs. As part of that process, Holdings is obligated to "convert to cash such of the non-cash assets of the Partnership as [Holdings] deems necessary or advisable" and "determine the closing capital accounts of the Partners." *Id.* § 9.2.

Mrs. Hawkins asserts that as part of the winding up process, Daniel and Holdings intend to market and sell the Majority Shares. Mrs. Hawkins alleges that the value of the Majority Shares will be maximized by selling them free and clear of the Irrevocable Proxy. She claims that Daniel and Holdings have indicated that they only will sell the Majority Shares subject to the Irrevocable Proxy. *See* Compl. ¶¶ 50–60.

## G. This Litigation

On May 24, 2021, Mrs. Hawkins filed this litigation and moved for expedited treatment. The complaint asserts two counts.

In Count I, Mrs. Hawkins seeks a declaratory judgment that the defendants "are required to market and sell the Partnership's 75% stake in ND Management free and clear from, and not subject to, the continued application of the Proxy." *Id.* ¶ 72. In Count II, Mrs. Hawkins seeks an injunction prohibiting the defendants "from marketing and/or selling the Partnership's ND Management stock subject to the continued application of the Proxy." *Id.* ¶ 74. Count II obviously describes a remedy and not a cause of action.

18

Mrs. Hawkins moved for expedited proceedings. The defendants opposed Mrs. Hawkins' motion and argued that the court should dismiss this case in deference to the New York Action. Dkt. 6; Dkt. 7. At a hearing on June 10, 2021, the court granted expedition and permitted the defendants to move for dismissal under the doctrine of *forum non conveniens* while the case otherwise moved forward. Dkt. 20.

## II.      LEGAL ANALYSIS

A motion to dismiss pursuant to *forum non conveniens* proceeds under Court of Chancery Rule 12(b)(3) as it "seeks dismissal on grounds of improper venue." *Holsopple*, 250 A.3d at 952. Whether to dismiss a case on the basis of *forum non conveniens* is an issue "addressed to the trial court's sound discretion." *Martinez v. E.I. DuPont de Nemours & Co., Inc.*, 86 A.3d 1102, 1104 (Del. 2014).

When exercising its discretion, the court considers the so-called "*Cryo-Maid*" factors," named after *General Foods Corp. v. Cryo-Maid, Inc.*, 198 A.2d 681 (Del. 1964). The factors are (1) the pendency or non-pendency of a substantially similar action in another jurisdiction; (2) the controversy's dependency on Delaware law; (3) the availability of compulsory process for witnesses; (4) the relative ease of access to proof; and (5) all other practical problems that would make the trial easy, expeditious, and inexpensive. *Id.* Traditionally, the court also considered the possibility of a view of the premises. That factor often is omitted in commercial cases such as this one where it has no relevance. *See Aranda v. Philip Morris USA Inc.*, 183 A.3d 1245, 1251 (Del. 2018).

The first *Cryo-Maid* factor asks whether there is (i) an earlier-filed action, (ii) between the same or substantially similar parties, (iii) addressing the same or substantially

19

similar subject matter, (iv) pending in a court capable of addressing the matter and providing justice (a "Prior Action"). Whether this factor is satisfied affects the approach the court takes to the balancing of the *Cryo-Maid* factors. *See Gramercy Emerging Mkts. Fund v. Allied Irish Banks, P.L.C.*, 173 A.3d 1033, 1036–38 (Del. 2017).

If a Prior Action exists and remains pending, then a Delaware court approaches the *Cryo-Maid* factors with the analysis tilted in favor of the defendant. Under an approach known as the *"McWane* doctrine," the court will dismiss or stay the Delaware action in deference to the Prior Action unless the *Cryo-Maid* factors weigh heavily in favor of allowing the Delaware action to proceed. *Id.* at 1037; *see McWane Cast Iron Pipe Corp. v. McDowell-Wellman Eng'g Co.*, 263 A.2d 281 (Del. 1970). Generally speaking, the calculus only will favor denying the motion and permitting the Delaware action to move forward, notwithstanding the existence of the Prior Action, if the Delaware plaintiff has invoked a specialized statutory proceeding designed to address a particular issue or if Delaware otherwise has a particularly strong interest in the dispute. *See Holsopple*, 250 A.3d at 953–954, 956.

If a Prior Action once existed but no longer is pending, then the Delaware court conducts a straightforward assessment of the *Cryo-Maid* factors to determine where it makes the most sense for the action to proceed. The resulting analysis "is not tilted in favor of the plaintiff or the defendant." *Gramercy*, 173 A.3d at 1044.

If the Delaware case is the first-filed action, then the court will approach the *Cryo-Maid* factors with the analysis tilted in favor of the plaintiff. The court generally will allow the Delaware action to proceed unless the defendant shows that it would face

20

overwhelming hardship or inconvenience from litigating in Delaware. *Id.* Although linguistically extreme, the overwhelming hardship standard is not impossible to meet. To satisfy it, the defendant must show that the *Cryo-Maid* factors "weigh heavily and decisively in favor of dismissal." *Holsopple*, 250 A.3d at 953 (internal quotation marks omitted). The defendant need not show that every factor supports dismissal, nor even that a majority of the factors support dismissal. Rather, "the trial court must consider the weight of those factors in the particular case and determine whether any or all of them truly cause both inconvenience and hardship." *Martinez*, 86 A.3d at 1104.

The defendants' argument for dismissal starts and ends with their contention that the New York Action qualifies as a Prior Action. They never go further than that. And despite purporting to ground their motion to dismiss in the doctrine of *forum non conveniens*, they devoted most of their briefs and their presentation during the hearing to an argument about claim splitting and an assertion that Mrs. Hawkins' claims conflict with the plain language of the Irrevocable Proxy.

## A.     The *McWane* Doctrine Does Not Apply.

In the only argument they advance in support of the motion they claimed to file, the defendants maintain that the *McWane* doctrine requires dismissal of this action in deference to the New York Action. It does not. The New York Action is not a Prior Action for purposes of the *McWane* doctrine. Although the New York Action involves the same parties, it does not involve the same or substantially similar issues.

This case presents two focused questions, neither of which is now or ever has been at issue in the New York Action. The first question is whether, under the terms of the

21

Irrevocable Proxy, the Partnership can sell the Majority Shares free and clear of the voting authority that the Irrevocable Proxy conferred. That question did not arise until recently, after the term of the Partnership ended and when Daniel and Holdings took the position that the Partnership only could sell the Majority Shares subject to the Irrevocable Proxy. That issue has never been raised in New York.

The second question concerns the scope of the fiduciary duties that Daniel and Holdings owe during the winding up process. Those duties affect their ability to make decisions about whether and how to sell the Majority Shares. Daniel owes fiduciary duties both as a Holder under the Irrevocable Proxy and as the controller of Holdings, which also owes fiduciary duties as the general partner of the Partnership. The fiduciary duties of the holder of a proxy run to the owner of the shares. *See Zohar II 2005–1, Ltd. v. FSAR Hldgs., Inc.*, 2017 WL 5956877, at *20 (Del. Ch. Nov. 30, 2017). The fiduciary duties that Holdings and Daniel owe as the general partner of the Partnership and its controller run to the Partnership. The fiduciary principle generally requires that a fiduciary act loyally and in good faith to maximize the value of an asset held in a fiduciary capacity for the benefit of the *cestui que trust. See Frederick Hsu Living Tr. v. ODN Hldg. Corp.*, 2017 WL 1437308, at *20 (Del. Ch. Apr. 14, 2017). Viewed in the abstract, the fiduciary principle therefore would seem to call for Daniel and Holdings to maximize the value of the Majority Shares by selling them free and clear of the voting authority conferred by the Irrevocable Proxy, if they have the ability to do so.

The New York Court has considered claims for breach of fiduciary duty, but no one has ever asked the New York Court to consider the operation of the fiduciary principle in

22

this setting. As with the application of the Irrevocable Proxy's language to a sale of the Majority Shares, the dispute over the implications of the fiduciary principle arose only recently, after the Partnership dissolved and after Daniel and Holdings took the position that the Partnership only could sell the Majority Shares subject to the Irrevocable Proxy.

Over the years that the New York Action has been pending, Mrs. Hawkins has advanced a number of claims in that proceeding, but none are the same or substantially similar to the focused issues presented by this case. At the outset of the New York Action, Mrs. Hawkins challenged the validity of the Irrevocable Proxy on the theory that it was an interim measure that would be replaced promptly with a more traditional governance regime. Mrs. Hawkins thus advanced a theory based on events that took place before the turn of the current millennium. When Mrs. Hawkins asserted that claim in 2013, the New York Court had little difficulty holding that it was time-barred. *See Second SDNY Dismissal*, 2015 WL 8480076, at \*4; *First SDNY Dismissal*, 2014 WL 3926811, at \*6–7. The New York Court did not rule how on the Irrevocable Proxy would apply during the winding up process to a sale of the Majority Shares. Nor did the New York Court address the fiduciary duties that Daniel or Holdings owe in that context.

In the New York Action, Mrs. Hawkins also challenged allegedly self-dealing transactions that the Holders engaged in before the turn of the current millennium, and she challenged an issuance of limited partner interests in Danco LP that took place in 2010. The New York Court held that those claims also were time-barred. *See SDNY SJ Decision*, 2020 WL 4349813, at \*10–11. There is no overlap between this case and those claims.

23

In the New York Action, Mrs. Hawkins also challenged the failure to restructure Danco GP as an S corporation. The New York Court held that Mrs. Hawkins was an improper derivative plaintiff for purposes of that claim. *See id.* at *8. The claims in this case do not implicate the disputed restructuring.

In the New York Action, Mrs. Hawkins sought to relitigate the withholding of distributions that had been the subject of the Tennessee action. The New York Court held that Mrs. Hawkins could not do that. *See id.* at *12. The claims in this case do not relate to those issues or any aspect of the Tennessee action.

In the New York Action, Mrs. Hawkins also challenged the payments that Daniel made in 2016 and 2017 to himself and the CFO of Danco Labs. The New York Court granted summary judgment in favor of the defendants on the payments to the CFO but denied the motion as to the payments to Daniel. *See id.* at *13–14. The propriety of those payments is the only remaining issue in the New York Action. The claims in this case have nothing to do with payments that Daniel received in 2016 and 2017.

In an effort to connect the current case to the New York Action, the defendants have taken allegations from the complaint in this action and compared them to allegations in the New York Action. Dkt. 16 Ex. 1. Those allegations describe the origins of the Sublicense, the Settlement Agreement, and the terms of the Irrevocable Proxy. The complaint in this action provides those facts as background, and they are necessary to understand and frame the dispute. The overlapping descriptions do not mean that this action and the New York Action involve the same or substantially similar issues.

24

The New York Action is not a Prior Acton for purposes of *McWane*. The narrow claims that Mrs. Hawkins has asserted in this action differ fundamentally from the matters that the New York Court has addressed.

Other than arguing that the New York Action is a Prior Action, the defendants have not attempted to show why any other *Cryo-Maid* factor supports dismissal. The motion to dismiss the current action on the basis of *forum non conveniens* therefore is denied.

## B. Mrs. Hawkins Has Not Engaged In Improper Claim Splitting.

In their briefs, the defendants devoted much of their firepower to arguing that Mrs. Hawkins has engaged in improper claim splitting. Their invocation of claim splitting fares no better than their reliance on *McWane*.

The rule against claim splitting is an "aspect of the doctrine of res judicata." *Maldonado v. Flynn*, 417 A.2d 378, 382 (Del. Ch. 1980). It seeks to "eliminate[] the contemporaneous litigation of the same factual or legal issues in different courts." *Balin v. Amerimar Realty Co.*, 1995 WL 170421, at *4 (Del. Ch. Apr. 10, 1995). The basic intuition is that "it is fairer to require a plaintiff to present in one action all of his theories of recovery relating to a transaction, and all of the evidence relating to those theories, than to permit him to prosecute overlapping or repetitive actions in different courts or at different times." *Maldonado*, 417 A.2d at 382. "Two basic principles animate the rule. First, the rule is founded upon the principle that no person should be unnecessarily harassed with a multiplicity of suits. Second, the rule is designed to prevent a litigant from getting two bites at the apple." *J.L. v. Barnes*, 33 A.3d 902, 918 (Del. Super. Ct. 2011) (cleaned up) (collecting authorities).

25

Delaware takes a modern, transactional view of claim splitting. *Goureau v. Lemonis*, 2021 WL 1197531, at \*8 (Del. Ch. Mar. 30, 2021). For the doctrine to apply, the claims must arise out of the same transaction or from a common nucleus of operative fact. *Id.* The Delaware Supreme Court has adopted the approach taken in Section 24 of the *Restatement (Second) of Judgments*, which calls for a pragmatic assessment by the trial court. *See LaPoint v. AmerisourceBergen Corp.*, 970 A.2d 185, 193 (Del. 2009). A comment to Section 24 states:

> The expression "transaction, or series of connected transactions," is not capable of a mathematically precise definition; it invokes a pragmatic standard to be applied with attention to the facts of the cases. And underlying the standard is the need to strike a delicate balance between, on the one hand, the interests of the defendant and of the courts in bringing litigation to a close and, on the other, the interest of the plaintiff in the vindication of a just claim. . . .
>
> In general, the expression connotes a natural grouping or common nucleus of operative facts. Among the factors relevant to a determination whether the facts are so woven together as to constitute a single claim are their relatedness in time, space, origin, or motivation, and whether, taken together, they form a convenient unit for trial purposes. Though no single factor is determinative, the relevance of trial convenience makes it appropriate to ask how far the witnesses or proofs in the second action would tend to overlap the witnesses or proofs relevant to the first. If there is a substantial overlap, the second action should ordinarily be held precluded. But the opposite does not hold true; even when there is not a substantial overlap, even when there is not a substantial overlap, the second action may be precluded if it stems from the same transaction or series.

*Restatement (Second) of Judgments* § 24 cmt. b (1982).

Litigation involving a series of transactions calls for a similarly pragmatic assessment that turns on the same factors. *Goureau*, 2021 WL 1197531, at \*9.

> When a defendant is accused of successive but nearly simultaneous acts, or acts which though occurring over a period of time were substantially of the

26

same sort and similarly motivated, fairness to the defendant as well as the public convenience may require that they be dealt with in the same action.

*Restatement*, *supra*, § 24 cmt. d. At the same time, "the rule against claim-splitting is not meant to 'preclude litigation of events arising after the filing of the complaint that formed the basis of the first lawsuit.'" *Leonard v. Stemtech Int'l, Inc.*, 2012 WL 3655512, at *9 (D. Del. Aug. 24, 2012) (*quoting Curtis v. Citibank, N.A.*, 226 F.3d 133, 139 (2d Cir. 2000)). Moreover, "[m]aterial operative facts occurring after the decision of an action with respect to the same subject matter may in themselves, or taken in conjunction with the antecedent facts, comprise a transaction which may be made the basis of a second action not precluded by the first." *Restatement*, *supra*, § 24 cmt. f.

For the reasons already discussed, Mrs. Hawkins is not attempting to relitigate the same factual or legal issues that she presented to the New York Court. The narrow questions that this case presents do not arise out of the same transactions that gave rise to the claims in New York.

There is, of course, a superficial similarity between the two cases, because both litigations (as well as the Tennessee action) trace their origins to the awarding of the Sublicense. There is also high-level overlap because both cases involve the Irrevocable Proxy, and both cases touch on Daniel's obligations as a fiduciary. But that is about it. The factual context is substantially different. The claims are substantially different.

It also is true that from Daniel's standpoint, the bottom-line outcome of losing in this litigation could be the same as if Mrs. Hawkins had prevailed on her original challenge to the Irrevocable Proxy. In both cases, Daniel could lose his ability to exercise the

27

Irrevocable Proxy going forward. But the nature of the claims, the facts giving rise to them, and their broader implications are fundamentally different. Had it been litigated, and had Mrs. Hawkins prevailed, then her claim about the temporary nature of the Irrevocable Proxy would have led to a judicial determination that some form of wrong occurred around the turn of the millennium, along with whatever attendant consequences such a ruling would have had for Daniel's subsequent actions. By contrast, if Mrs. Hawkins were to obtain the declaratory judgment or injunctive relief that she seeks in this action, they would apply only to the winding up process that started in February 2021. They would have no effect on any earlier actions that Daniel might have taken.

The defendants also are incorrect in contending that the earlier decisions in the New York Action have a preclusive effect on the current litigation. The New York Action has not yet become final. The two dismissal rulings and the summary judgment decision are both interlocutory rulings that do not have collateral estoppel or *res judicata* effect. That said, in the interest of judicial efficiency, this court will not revisit the New York Court's rulings, nor will the court permit Mrs. Hawkins to litigate claims that the New York Court has rejected.

Both here and in its ruling on the doctrine of *forum non conveniens*, the court is not suggesting that the New York Court is not capable of addressing the claims in this action. Such an assertion would be preposterous. The New York Court plainly could resolve the claims in this case, just as it could resolve virtually any dispute that the parties might have. But that is not the issue. The question is rather whether Mrs. Hawkins was obligated to

28

assert her claims through an amended complaint in the New York Action because she has been litigating there over other disputes involving the Partnership.

The substantial distinctions between this case and the New York Action mean that Mrs. Hawkins was not obligated to assert her current claims through an amended complaint in the New York Action. For her to do so would have been inefficient, because the New York Action currently is proceeding to trial on the fairness of the compensation that Daniel received in 2016 and 2017. It would make little sense for the New York Action to return to the pleading stage. The New York Court has ruled on two pleading-stage dismissal motions and a motion for summary judgment. Along the way, the court ruled on a motion to compel. *See Hawkins v. MedApproach Hldgs., Inc.*, 326 F.R.D. 391 (S.D.N.Y. 2018). The doctrine of claim splitting does not require that the New York Action return to the starting line.

Mrs. Hawkins is not engaging in claim splitting. Mrs. Hawkins has acted properly by filing her complaint in this court.

## C.     The Implicit Rule 12(b)(6) Motion

In addition to arguing about claim splitting, the defendants used their Rule 12(b)(3) motion to advance an argument about the plain language of the Irrevocable Proxy. In substance, the defendants sought to show that Mrs. Hawkins has not stated a claim on which relief can be granted. The defendants' Rule 12(b)(3) motion was not an appropriate vehicle to advance an argument under Rule 12(b)(6), and the court declines to consider it.

The defendants' plain language argument also does not reach Mrs. Hawkins' arguments about Daniel's and Holdings' fiduciary obligations. Mrs. Hawkins maintains

29

that even if the plain language of the Irrevocable Proxy were to call for a sale subject to the Irrevocable Proxy, then Daniel still would have a fiduciary obligation to seek to sell the shares free and clear of the Irrevocable Proxy, for example by invoking the Termination Provision. The defendants' plain language argument does not address that theory.

To blunt the potential implications of the fiduciary principle, the defendants argue that Daniel also holds the Irrevocable Proxy "for the benefit of the broader [RU-486] Project and its many investors who were induced to invest based upon the governance structure set forth in the [Irrevocable] Proxy." Dkt. 16 at 2. In essence, the defendants argue that other investors, such as other limited partners in Danco LP, are intended third-party beneficiaries of the Irrevocable Proxy and that Daniel is legally obligated to protect their interests. That is an interesting argument, and it is possible that a conflict may exist between the fiduciary principle and a contractual obligation.

The parties have not engaged in meaningful briefing on these issues. As with the defendants' plain language argument, the defendants' Rule 12(b)(3) motion is not the appropriate vehicle to address that aspect of the dispute.

## III.    CONCLUSION

The defendants' motion to dismiss the complaint in favor of the New York Action is denied.